**BRIANT et al. v. McGOWN et al.   (No. 7322.)\***

Court of Civil Appeals of Texas. Austin.
March 13, 1929.

Rehearing Denied March 20, 1929.

Collins, Jackson & Snodgrass, of San Angelo, for appellants.

Tyler & Hubbard, of Belton, Dalton & Vinson and Harris, Harris & Sedberry, all of San Angelo, and E. C. Zellner, of Belton, for appellees.

McCLENDON, C. J. The controlling question in this case involves the proper construction of item 22 in the 1925 codicil to the will of J. D. Sugg, deceased, under which appellee Mrs. Nettie McGown and her children were given all of Sugg's stock in the Accidental Oil Mills. At the time the codicil was written, the testator had advanced over $200,000 to the oil mill, which was in excess of the value of its assets; and the question presented is whether the legatees took the stock freed from or charged with the amount of these advances as an indebtedness against the corporation.

The suit was by Mrs. McGown (her husband joining), her children, and the oil mill, against Briant, Sugg's independent executor, and the residuary legatees, to recover the proceeds of an agreed sale of the corporate assets. The trial was upon an agreed statement of facts, to the court and without a jury; and the judgment was in favor of Mrs. McGown and the other plaintiffs. The executor and his codefendants have appealed.

The item in question reads:

"22nd: I hereby change Item 2 of my original will so as to provide that Mrs. Nettie McGown and her children now living have share and share alike all of my stock in the Accidental Oil Mills, this stock being in place of the Mid-Texas Oil Co. stock. There is no longer owned by me the Mid-Texas Oil Co. stock but the property owned by said corpo-

---

\*Writ of error refused.

ration is now owned by the Accidental Oil Mills."

Item 2 of the original will, written in 1915, which was changed by item 22 of the 1925 codicil, reads:

"2nd: I give and bequeath unto my niece, Mrs. Nettie McGown and to her children now living, my ranch in Tom Green County, Texas, consisting of ten thousand acres about six miles S. W. of San Angelo, known as the 'Twin Mountain Ranch.'

"I also give and bequeath unto my niece Mrs. Nettie McGown of Cotton Plant, Arkansas, the sum of Five Thousand Dollars (and 450 shares of the capital stock of the Mid Texas Oil Co. of Belton Texas) and to each of the children now born unto the said Nettie McGown or that may hereafter be born under her during my lifetime, the sum of Five Thousand Dollars each."

Appellees contend that the following item of the 1925 codicil also has bearing upon the question:

"21st: With regard to Item 25 of my original will I direct that my executor reduce to cash as early as practical after my death, all of the property notes bonds etc. coming under this Item and divide the proceeds of such sale as therein provided, such sales not be made in haste and at a sacrifice but to use his good judgment as to values and the advisability of selling at prices offered, but in this connection it is my will and I now direct that before any distribution is made as provided in Item 25 of my original will that my executor pay all taxes of all natures due by my estate at the time of my death and to pay all inheritance taxes due the federal government as well as that may be due any state so that all bequests made in my original will and all codicils thereto may not be impaired but to be free and clear of all taxes and liens and to be net the different beneficiaries under my will I also direct that if I owe any debts at the time of my death that my executor pay same as early as practical and to pay all special bequests as early after the probating of this will as convenient."

The facts which we think control the issue, briefly stated, follow:

J. D. Sugg, a bachelor, owned a very large estate. In his original (1915) will he made large bequests to his several nieces and nephews, and a number of bequests to friends. Mrs. McGown and other nieces and nephews were made residuary legatees. An April 27, 1921, codicil made a number of changes in specific bequests, not material to the question here. The (July 18th) 1925 codicil made other changes in specific bequests, including those above quoted.

When the original will was signed, Sugg owned 450 shares of stock in the Mid Texas Oil Mill, and also held a mortgage upon its properties. This mortgage he afterwards foreclosed and bought in the property. In 1919 he organized the Accidental Oil Mills, with a capital stock of 3,000 shares, and conveyed to the corporation the property he had acquired under the foreclosure. Shortly after the charter was issued, there were meetings of the stockholders and directors at which Sugg was elected president, Tomlinson secretary and treasurer, and Kirkpatrick vice president. No other meetings of the stockholders or directors were held during Sugg's life. One share of stock was in the name of Kirkpatrick and another in the name of Tomlinson, neither of whom paid anything for the stock, which was put in their respective names in order that they might qualify as directors and officers of the corporation. All of the other stock was in the name of Sugg. The corporation acquired a stock book, and certificates were made out in favor of the stockholders as stated and signed by Tomlinson as secretary, and the corporate seal placed thereon. Sugg, the the president, never signed these certificates. The affairs of the company were directed by Sugg through Tomlinson as general manager; the latter following Sugg's direction in the conduct of the business. During the year 1920, Sugg advanced large sums of money to the corporation, and thereafter he was paid back various sums in money and in products of the mill, which items were credited on the books of the corporation to the advance account. At the time of Sugg's death, the books showed a balance in his favor of something over $200,-000. During all of Sugg's life, Tomlinson as general manager rendered to him on the 1st day of each month a financial statement of the corporation's operations, which statements always showed the amount of Sugg's advances as a liability. These statements, accompanied by letters from Tomlinson as manager, were after Sugg's death sent to Briant, Sugg's independent executor, who assumed the same control and management of the properties of the corporation as did Sugg during his lifetime; Tomlinson continuing to act as general manager, but consulting and carrying out the wishes of Briant as he had theretofore done with reference to Sugg.

No stockholders' or directors' meeting was held after Sugg's death until the meeting of September 4, 1926, noted below. The corporation operated at a great loss and never at a profit. In view of this fact, the executor and the plaintiffs made an agreement whereby all the property of the corporation should be sold for the sum of $80,000 in money and notes; the proceeds of the sale to be deposited with Briant as executor under the stipulation that he should hold the money, collect the notes and outstandings, pay debts, and hold all assets subject to final adjudication of their ownership. In order to carry out this agreement, a stockholders' and directors' meeting was held on September 4, 1926, at which Kirkpatrick was elected president and

Tomlinson secretary, and the sales agreement ratified. The sale was made and the proceeds delivered to Briant in accordance with the agreement. On November 19, 1926, another meeting of the directors was held at which Tomlinson was authorized to execute a note in favor of Briant as executor for $100,000, and on the same day this note was executed and delivered to Briant, who charged off $100,000 of the $200,000 claim of the estate against the corporation and obtained a credit of like amount in the estate's income tax return. None of the plaintiffs, other than the corporation through its directors, was consulted or had anything to do with this stockholders' meeting or the execution of the note. At the time the 1925 codicil was executed and at the time of the death of Sugg, the properties of the corporation were not worth the sum of $200,000. When Sugg executed the 1925 codicil, he stated to his attorney who drew it, in connection with item 22 thereof, that "Nettie (referring to Mrs. McGown) had an old boy and that she could send him over there and if he could do anything with the mills By God he was a good one."

The contentions of the respective parties are substantially as follows:

Of appellants: Under item 22 of the 1925 codicil, Mrs. McGown and her children took only Sugg's share of the capital stock of the corporation; there being nothing in the will from which it could be inferred that the testator intended the bequest to be free and clear of claims he or his estate then had or might thereafter have against the corporation.

Of appellees: Construing the will in the light of the surrounding circumstances and the condition of the subject-matter of the bequest, the expression "stock" was used in the sense of the testator's rights, interest, or capital invested in the oil mill, the operation of which Sugg conducted as a business under a corporate existence as a mere convenience, and that it was his manifest intention to make a substantial bequest, which intention would be wholly defeated by assuming that he regarded the advances made by him to the business as an asset of his estate or a liability of the corporation to be paid out of the assets as against the objects of his bounty.

Appellees further contend that any claim Sugg may have had for advances was barred by limitation at the time of the 1925, codicil, at the time of his death, and at the time the sale was made. The conclusion we have reached renders it unnecessary to consider this contention.

The canons for the construction of wills are so well established that they need not be set out in detail.

■ That principle which we think should be applied in resolving the issue at bar, a principle that has often been applied by the courts in the construction of wills and other documents, may be stated thus: In the construction of such instruments, the courts are permitted to place themselves as nearly as possible in the position of the testator, and view the subject-matter and surrounding circumstances in the same light as he viewed them, and from such viewpoint to give to the language employed that construction which most nearly comports with the manifest object or intention of the testator.

■■ It will not be presumed that a testator in making a specific bequest intended to do a useless thing, or that the objects of his bounty should receive no benefits or rights of substantial value. A technical or literal interpretation of the language used should be avoided where it would bring about this result.

We do not think item 21 of the 1925 codicil can be construed as bearing upon the proper construction of item 22. Specifically, item 21 refers only to debts of the testator and taxes. It cannot properly be construed as applying to debts of corporations in which he was a stockholder. The question here presented is the meaning of the testator in the expression "stock" as used in item 22.

Nor do we attach any particular importance to Sugg's above-quoted statement to his attorney when he executed the 1925 codicil. It does indicate, however, that he regarded the mill business as a financial problem, difficult, if not impossible, of successful solution; and that he desired to give Mrs. McGown's son a chance to work it out. In the light of his own experience, that of uniform loss, it could not reasonably be presumed that he intended this son to pay off an indebtedness to his estate in excess of the value of the entire assets of the mill.

■ "The expression 'capital stock' [and the same is true of 'stock'] has been given a variety of meanings and shades of meaning, according to the sense or context in which it is employed." Refining Co. v. Staples (Tex. Civ. App.) 260 S. W. 614, 14 C. J. p. 380 et seq.

In some instances it is held to apply to a corporation's property or assets (14 C. J. p. 382), and in this sense the Supreme Court construed it in Refining Co. v. Staples (Tex. Com. App.) 269 S. W. 420. There the capital stock of a corporation was held to be its gross assets. While this court did not agree with that interpretation in the case there presented (see 260 S. W. 614), we recognized that in a proper case this interpretation of the term was permissible. If this latitude is allowed in the construction of statutes, we see no reason why an individual in making a special bequest should be held to a strictly technical definition in using the same word as a vehicle to express his intention.

Taking into consideration the following facts: That Sugg was the sole owner of the corporation and its assets; that the business, though conducted in the corporate name, was

under his sole direction the same as if no corporation existed; that no note or other evidence of indebtedness was executed in connection with the advances; that no corporate meetings of any character were ever held; that the business was always conducted at a loss and never at a profit; that the corporate assets at the time of the 1925 codicil and at the time of Sugg's death were less in value than the amount of the advances—we believe it manifest that it was the intention of Sugg in item 22 of the 1925 codicil to give to Mrs. McGown and her children his interest in the corporate assets free of any claim he might otherwise have for advances. To give the language employed the construction for which appellants contend would import in the testator an intention to do a useless thing; that is, give to Mrs. McGown and her children corporate stock of no value whatever because burdened with corporate liabilities far in excess of the value of corporate assets.

This view is in accord with the judgment of the trial court, and that judgment we affirm.

Affirm.